UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-14047-CR-MARTINEZ/LYNCH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ANTHONY I. JOHNSON,

    Defendant.

_____/

FILED by _____ D.C.

JAN 1 0 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS [D.E. #170]

**THIS CAUSE** having come on to be heard for an evidentiary hearing on January 8, 2014 in respect to the aforementioned motion filed by the Defendant Johnson, and this Court having reviewed the motion, the response and reply and having conducted an evidentiary hearing at which time this Court received testimony, evidence, and argument, makes the following recommendations to the District Court:

    1.    The Defendant's motion asserts a theory that there was some sort of a remote GPS/Onstar technology which permitted law enforcement, either directly or by way of a third party such as Onstar, to disable the vehicle in which the Defendant was riding. At the conclusion of the evidentiary hearing, counsel for the Defendant argued that while there may not have been any evidence submitted to support this theory of a "remote disabling" of the subject vehicle in which the Defendant was riding, that the traffic stop was still unreasonable and a constitutional violation under the Fourth Amendment.

    2.    The evidentiary hearing proceeded with counsel for the parties and the Defendant present. During the evidentiary hearing, this Court clarified with counsel for the

Defendant that the Motion to Suppress addressed solely the traffic stop as alleged in the motion. Counsel for the Defendant stated that the Motion to Suppress only challenges the traffic stop and any subsequent search of the vehicle which may have been a direct result of that traffic stop. Counsel for the Defendant agreed that the Motion to Suppress does not seek suppression of any statements which may have been made by the Defendant in spite of the fact that the motion is entitled "Motion To Suppress Evidence and Statement." This Court received no evidence at this hearing concerning any statements made by the Defendant, whether they be pre-Miranda or post-Miranda in nature. As a result, this Court will not address in its Report and Recommendation any issues concerning possible statements which may have been made by the Defendant.

3. The first witness called by the government was Scott Johnson of the Port St. Lucie Police Department. He has worked for that department for a number of years and has experience with other law enforcement agencies as well. On July 8, 2013, he was on duty in his department offices in Port St. Lucie. He heard a series of radio transmissions from his department dispatcher concerning possible bank robberies having just occurred in St. Lucie County. These dispatch transmissions indicated that one of the vehicles may have been heading south from Fort Pierce on I-95 towards the Port St. Lucie area.

4. Officer Johnson left his offices and got on his department issued motorcycle. He headed north on Airoso Boulevard towards the Crosstown Expressway which intersects with I-95 in Port St. Lucie. He headed in that direction since there are certain areas in the City of Port St. Lucie which are monitored by police in a situation such as this where officers observe vehicles which may match the description of a vehicle being sought. Other law enforcement agencies in St. Lucie County, as well as the Port St. Lucie Police

Department, were covering various areas throughout St. Lucie County, the City of Port St. Lucie and specifically the I-95 corridor.

5. Since the Defendant's motion alleges a theory that some technology was utilized to remotely disable/stop the Defendant's vehicle, the government asked Officer Johnson if on July 8th he had any ability to "push a button" to stop a vehicle in any way. Officer Johnson confirmed that he is not familiar with his department having that capability in any way, shape or form. He further stated that he did not have that ability to stop the Defendant's vehicle from his motorcycle.

6. Government's Exhibit No. 1, admitted into evidence without objection, is a compact disc recording of various radio transmissions from the various law enforcement agencies which were involved in locating the vehicles involved in these bank robberies in St. Lucie County on July 8, 2013. The government played portions of Government's Exhibit No. 1 on the record for Officer Johnson and later for Detective Pearson later during the hearing. Officer Johnson testified that he has listened to this compact disc recording and the radio transmissions accurately reflect what he heard on July 8, 2013.

7. Government's Exhibits Nos. 2A and 2B admitted into evidence at this hearing without objection are aerial Google maps of the areas of Port St Lucie which both Officer Johnson and Detective Pearson used during their testimony in respect to locating and pursuing the Defendant's vehicle.

8. Government's Exhibits Nos. 3, 4, 5, 6 and 7 were also admitted into evidence without objection from the Defendant. Government's Exhibits Nos. 3, 4 and 5 are photographs of the vehicle in which the Defendant was a passenger and the location where it was finally stopped. Government's Exhibits Nos. 6 and 7 are photos of the money taken

on July 8, 2013 from the PNC Bank at the Orange Blossom Mall on Okeechobee Road in Fort Pierce which contained the GPS money tracking device.

9. Officer Johnson testified that the description of the vehicle seen leaving the PNC Bank robbery on Okeechobee Road was a silver or white minivan occupied by several black males with masks and guns. Further, Officer Johnson recalls the dispatcher saying that there was a GPS money tracker in the money pack which had been given to the individuals who robbed the bank. Apparently the law enforcement dispatchers had the ability to monitor the GPS money tracker on a map to simultaneously advise officers where the vehicle containing the money pack was traveling. Officer Johnson said that he was not familiar with the specific technology of how the GPS money tracker works nor how his dispatcher was able to follow the path of the vehicle by use of the money tracker. He simply followed the information being transmitted by the dispatchers regarding the location of the vehicle. As he was traveling towards the Crosstown Expressway in Port St. Lucie, Officer Johnson's dispatcher stated that the vehicle was southbound on I-95.

10. Officer Johnson stated that the officers were first looking for a silver or white minivan. Thereafter, the dispatcher stated that the vehicle had stopped for a period of time. Law enforcement officers then began looking for vehicles, other than mini vans, with occupants matching the description of the persons who had robbed the PNC Bank. He testified that this was done because the information that the vehicle had stopped for a period of time may have indicated that the persons involved in the PNC Bank robbery had switched vehicles. Therefore, Officer Johnson was looking for any vehicles which either matched the initial description of a white or silver minivan and/or vehicles containing

4

occupants which matched the description of several black males seen leaving the bank robbery.

11.     While westbound on the Crosstown Expressway in Port St. Lucie, Officer Johnson saw several vehicles coming towards him being followed by law enforcement vehicles. The dispatcher was advising that the GPS money tracker was indicating that the vehicle containing the money was in that immediate vicinity. He decided to turn around and follow those vehicles since his dispatcher said the GPS signal from the money tracker showed the vehicle heading southbound on California Avenue in Port St. Lucie at that time. He had already passed that street so he made his U-turn to go eastbound on the Crosstown Expressway towards California Avenue.

12.     Officer Johnson testified that he saw no minivans matching the description, but did see a small Honda in an area where the dispatcher said the money tracker was sending back a GPS signal. He stopped the Honda and quickly determined that it was occupied by one person being a white female driver. Since the occupant did not match the description of the persons believed to be involved in the PNC robbery, he immediately let that vehicle go and continued down California Avenue.

13.     At that time there were three civilian vehicles in front of him. The dispatcher was advising that the GPS money tracker was sending back a signal from that very location. Two of the vehicles in front of Officer Johnson turned off into a shopping plaza. He decided to follow the third vehicle to determine if it may have contained the money and individuals involved in the PNC robbery. He turned on his emergency lights and stopped the vehicle. The vehicle he stopped was a white Chrysler sedan and was later found to contain the money and GPS money tracker taken from the PNC Bank.

14. The vehicle did pull over and stop in response to Officer Johnson's emergency lights. Officer Johnson stated that he could not identify any of the occupants at that time. He saw one front passenger turn and look back at him which indicated to him that there were at least two people in the vehicle. His intention was to approach the vehicle to determine whether the occupants matched the description given of the persons involved in the bank robbery.

15. Before Officer Johnson could get off of his motorcycle and approach the vehicle, the vehicle immediately took off at a high rate of speed. Officer Johnson estimated that the vehicle took off no more than two to three seconds after it initially stopped on the side of the road.

16. Officer Johnson then pursued the vehicle and transmitted his location to his dispatcher. He described the white Chrysler and gave the tag number out as he followed it. He followed the vehicle onto Southwest Cameo Boulevard at a high rate of speed. The vehicle ran through red lights and at various times it traveled into oncoming traffic lanes in an attempt to elude him.

17. The vehicle next turned westbound on Port St. Lucie Boulevard and then shortly thereafter southbound on Chestnut. These streets are reflected in Government's Exhibit No. 2B. The vehicle then went westbound on Aster Road. There were other officers on foot in that area along with other law enforcement vehicles. The vehicle was eventually stopped in the vicinity of 765 Aster Road. The Defendant and two other black males and the black female driver were taken into custody.

18. Officer Johnson learned from other officers at the scene that the vehicle did contain the GPS money tracker and the money taken from the PNC Bank robbery. These

items are depicted in Government's Exhibits Nos. 6 and 7. A firearm was also found in the car. There were shots fired by law enforcement when the vehicle was attempting to avoid the stop. No one was injured and the vehicle eventually was brought to a stop with its front end in a culvert as reflected in Government's Exhibits Nos. 3, 4 and 5. Officer Johnson testified that there was a box with the money in it along with the GPS money tracker. This is reflected in Government's Exhibit No. 6 which is the box seen on the ground outside the vehicle next to a blue sneaker.

19. Officer Johnson stated that at the time that he made the first stop of the vehicle, he had not observed any traffic violations or violations of any law. He was stopping the vehicle to briefly make a determination as to whether or not the occupants matched the description of the bank robbers since the dispatcher was advising that this was the last location from which the GPS money tracker was sending a signal. He testified that, just as he had done previously with the Honda he had stopped, if the occupants of the white Chrysler did not match the description of persons involved in the bank robbery, then he was going to let the white Chrysler vehicle go. However, before he could even check the occupants of the vehicle, it took off within two or three seconds at a high rate of speed. Officer Johnson testified that he observed the white Chrysler violate several traffic laws as he attempted to stop it again. Some of those violations were speeding, failure to obey a command to stop, passing at an intersection, running a red light, improper passing, running a stop sign and reckless driving.

20. Officer Johnson testified that at the time of the first stop of the white Chrysler, if the occupants appeared to match the description of the bank robbers, he would have attempted to continue with what he characterized as a felony stop to make further inquiry

of the occupants to determine if they were in fact involved in the PNC Bank robbery since the GPS money tracker was sending a signal from that general vicinity. Once the vehicle left within two or three seconds at a high rate of speed, this "heightened his suspicions" that the vehicle was in fact involved in the PNC Bank robbery. Officer Johnson did not arrest anyone. He did not take any statements nor seize any evidence in this case.

21. On cross-examination, Officer Johnson confirmed that his department does not utilize Onstar or any third party emergency stop service. He is not aware of any such service being available to him or his department. In fact, he testified that because of the high speed chase and the dispatcher's continual monitoring of the GPS money tracker, he did not believe anyone would have had sufficient time to even contact Onstar or a third party to initiate any such emergency stop. There was no evidence submitted during the hearing that the white Chrysler vehicle in fact possessed any Onstar or any other technology which would have permitted a third party to make a remote stop of that vehicle.

22. Officer Johnson testified that he is not sure if the money tracker is in the money pack depicted in Government's Exhibit No. 7 or if the money tracker is within the box itself. He did not take those photographs. He was advised by other officers, who made the seizure, that the GPS money tracker is the item depicted in Government's Exhibit No. 7.

23. Officer Johnson admitted on cross-examination that the white Chrysler vehicle did not match the initial description of a white or silver minivan which was seen leaving the PNC Bank robbery on Okeechobee Road in Fort Pierce. However, he stated that his stop of the white Chrysler was based upon the GPS money tracker location information he was receiving from his dispatcher. Once the white Chrysler left the scene

of the first stop within two or three seconds, then the second attempt to stop the vehicle by Officer Johnson was based upon his observations of several traffic law violations and his heightened suspicion that the vehicle was in fact containing the GPS money tracker taken during the bank robbery.

24. As the white Chrysler attempted to elude law enforcement in the Aster Road area, Officer Johnson was in pursuit and he observed a black Ford SUV ram the white Chrysler and force it off the road. The Ford SUV was driven by Detective Pearson of the St Lucie County Sheriff's Office. Government's Exhibits Nos. 3, 4 and 5 reflect the relative positions of the white Chrysler and the Ford SUV after the stop.

25. On redirect examination, Officer Johnson testified that during that first very brief initial stop of the white Chrysler vehicle, he could see the front passenger was a black individual.

---

26. The next witness called by the government was Detective Keith Pearson of the St. Lucie County Sheriff's Office. He was on duty on July 8, 2013 at the time that there were simultaneous bank robberies in St. Lucie County. He was in his offices in Fort Pierce and heard the radio transmissions about these bank robberies which indicated one of the robberies occurred near Okeechobee Road. He then got into his black Ford SUV and traveled towards Okeechobee Road.

27. While he was driving towards the PNC Bank location on Okeechobee Road, he heard the dispatcher say that the GPS money tracker was being monitored and that the vehicle containing the money tracker was southbound on I-95 near the Crosstown

Expressway. Detective Pearson has some prior experience with GPS tracking devices. He testified that his department was not using Onstar nor any other third party tracking technology to either track and/or remotely stop the vehicle in question. In his experience, there could be a two to seven minute delay in the various locations that the GPS tracker signal may be sending back to where it was being monitored.

28. Detective Pearson was not familiar with the specific technology nor how his dispatcher was monitoring this GPS money tracker. He was acting solely upon the information being transmitted over the law enforcement radios from the dispatchers who were tracking the vehicle by use of the GPS money tracker within the money pack taken during the PNC Bank robbery on Okeechobee Road.

29. Based on the information provided by the dispatcher, Detective Pearson got off I-95 at the Crosstown Expressway which was the last known location from which the GPS money tracker had sent a signal. He then continued eastbound on the Crosstown Expressway looking for a silver minivan. He never saw any van in that area where the GPS tracker was sending a signal. He then turned onto Cameo Boulevard in Port St. Lucie to head back west towards I-95. While in this location, he observed a vehicle running a red light at Cameo and Port St. Lucie Boulevards traveling at a fairly fast rate of speed.

30. Detective Pearson immediately turned and activated his siren and emergency lights. He then continued to pursue the vehicle. He observed in his rearview mirror other vehicles from the Port St. Lucie Police Department were also in pursuit of this vehicle which was a white Chrysler.

31. Government's Exhibit No. 1 contains radio traffic involving the St. Lucie County Sheriff's Office dispatcher as well. Detective Pearson testified that he has listened

to this recording and it does contain his department's radio band. He stated the recording is accurate as to radio traffic he heard at the time of these events. Additional portions of the recording were played on the record just as had been done during Officer Johnson's testimony.

32. Detective Pearson testified that when he saw the vehicle run the red light at Cameo and Port St. Lucie Boulevards, he could see that it contained what he believed to be four black males. This would match the general description of the persons involved in the PNC Bank robbery. He stated that while he was pursuing the vehicle, he could see that the driver was a black female and the other three occupants were black males. The occupants of the vehicle kept turning back and looking towards him. The vehicle then turned onto Chestnut and then Aster as referenced previously during Officer's Johnson's testimony. Other traffic in the area had to slam on their brakes in an attempt to not collide with the white Chrysler while it was attempting to elude Detective Pearson and the other law enforcement vehicles.

33. Detective Pearson testified that neither he nor any member of his law enforcement department used Onstar nor any other third party technology to stop the white Chrysler vehicle. He used his vehicle to force the white Chrysler off the road. He rammed it a couple of times to get it to stop where it finally landed as reflected in Government's Exhibits Nos. 3, 4 and 5. He testified that the front end of the white Chrysler ran into a small culvert which can be seen in these exhibits. The vehicle came to an abrupt stop. It had to later be removed by use of a tow truck.

34. Detective Pearson's driver's side door was pinned against the right side front passenger doors of the white Chrysler. He identified the Defendant in court at this hearing

as the person who was in the front passenger seat of the white Chrysler. Neither the Defendant nor Detective Pearson could exit their vehicles since these vehicles were pinned against each other as reflected in Government's Exhibits Nos. 3, 4 and 5.

35. Detective Pearson testified that while he was pursuing the white Chrysler in an attempt to get it to stop, he observed this Defendant reaching down between his legs on the floor of the car. Detective Pearson believed that the Defendant may have been reaching for a weapon since he had information from the dispatchers that the individuals who robbed the PNC Bank were armed.

36. Detective Pearson identified the money tracker in Government's Exhibit No. 7. He testified that it appears to be a little thicker than a credit card based upon his prior experience with these devices.

37. He testified that based on all of the information which he had at the time, he believed that the vehicle running from him had been involved in the PNC Bank robbery. Also, he has prior experience involving robberies and knows that sometimes individuals switch vehicles to avoid capture. Therefore when the white Chrysler ran the red light, he immediately turned his attention to that vehicle even though it did not match the description of a white or silver minivan. If that white Chrysler had not run the red light, he would not have paid any attention to it. He would have just looked at it and let it go. He was in fact looking for a silver minivan with three black males in it at that time. However, if he had seen a vehicle with occupants matching that description, he would have stopped the vehicle to make a quick determination as to whether or not those individuals were involved in this bank robbery.

38. On cross-examination, Detective Pearson testified that he did not take the photograph of the GPS money tracker as reflected in Government's Exhibit No. 7. He has not seen any GPS tracking device in this case. Based upon his prior experience, the GPS money tracker sends a signal and does not receive a signal. He is aware that his department does have GPS tracker technology to permit the tracking of devices such as in this case. He does not know exactly how the signal is transmitted to a map for the dispatcher to track movement of the vehicle involved.

39. Detective Pearson testified that Government's Exhibit No. 4 shows the front of the white Chrysler vehicle in a culvert and that it had to be removed by a tow truck. He once again testified that the vehicle came to an abrupt stop and right before being stopped it ran over a mailbox before hitting that culvert.

---

40. The government then rested its case. The Defendant rested as well without presenting any witnesses or evidence.

---

## ANALYSIS

41. The theory of the Defendant set forth in his Motion To Suppress is that there was some outside force or third party, such as Onstar, employed by law enforcement to involuntarily stop the white Chrysler in which the Defendant and his co-defendants were riding. Counsel for the Defendant admitted during his closing argument that no evidence

was brought forward at this hearing which would support such a theory. Therefore, counsel for the Defendant argued that the stop of the white Chrysler, whether or not it was aided by a third party as originally argued, was still unreasonable and a violation of the Defendant's constitutional rights. Therefore, this Court must analyze the traffic stops conducted by Officer Johnson and by Detective Pearson.

42. Law enforcement officers may seize a suspect for a brief investigatory Terry stop where the officers have a reasonable suspicion that the suspect was involved in or was about to be involved in criminal activity and the stop was reasonably related in scope to the circumstances which justified the interference in the first place. Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence. The Fourth Amendment requires at least a minimal level of objective justification in making such a Terry stop. In viewing the facts within the framework of knowledge of the officers at the time that the Terry stop is initiated, the Court looks to the totality of the circumstances to determine whether or not there existed reasonable suspicion required to justify a Terry stop. United States v. Jordan, 635 F.3d 1181 (11th Cir. 2011).

43. A person's proximity to illegal activity may also be considered when determining whether or not there are reasonable grounds to justify detention. United States v. Clark, 337 F.3d. 1282 (11th Cir. 2003). In this instance, Officer Johnson was receiving real-time information from a law enforcement dispatcher that there was a vehicle in his vicinity which was emitting the GPS money tracker signal. Even though there were no silver or white minivans in the area, the evidence established that there existed the possibility that the bank robbers had in fact switched vehicles. Therefore, Officer Johnson

14

was looking for any vehicles occupied by individuals matching the descriptions of the persons seen robbing the PNC Bank. This is why he stopped a Honda which he quickly determined was being operated by a lone white female driver. The Honda was immediately allowed to proceed on.

44. Counsel for the Defendant argued at the conclusion of the hearing that these officers were stopping all vehicles. This is not the evidence which this Court heard. The officers were attempting to identify occupants of vehicles in the vicinity of the GPS money tracker signal as it was being related to them by the law enforcement dispatchers. This was not an anonymous tip which they were acting upon. Both Officer Johnson and Detective Pearson were acting upon real-time information being provided to them from law enforcement dispatchers who were following the vehicle by use of the GPS money tracker signal on a map of Port St. Lucie. This is corroborated by the transmissions recorded on Government's Exhibit No. 1.

45. Law enforcement officers may stop and briefly detain a person to investigate such a reasonable suspicion that a person or persons may be involved in criminal activity even though probable cause for an arrest would be lacking. United States v. White, 593 F.3d 1199 (11th Cir. 2010). In this case, Officer Johnson stopped the white Chrysler and within two or three seconds the white Chrysler took off at a high rate of speed. Officer Johnson testified that his original intention was to approach the white Chrysler vehicle, investigate whether its occupants matched the description of the bank robbers. If they did, he would proceed with a felony stop making further inquiry of the occupants. He did not randomly select this vehicle. He testified that the white Chrysler vehicle was in the vicinity of the GPS money tracker signal and was traveling on the same road as his dispatcher was

relating. He had a reasonable suspicion that the vehicle with the bank robbers and the GPS money tracker was in the immediate vicinity of where he was located at the time. He stopped the white Chrysler to either confirm or dispel his reasonable suspicions.

46.     Based upon his testimony, this Court finds that Officer Johnson's suspicions were in fact reasonable and that he was able to articulate specific reasons why he selected the white Chrysler vehicle to stop in order to make inquiry of its occupants. This was more than an inchoate and unparticularized suspicion. It was based upon information he was receiving from a law enforcement dispatcher who related that the signal from the GPS money tracker was coming from that same road and specific vicinity. See United States v. Gordon, 231 F.3d 750 (11th Cir. 2000).

47.     The initial stop of the white Chrysler by Officer Johnson is the stop which must be viewed under the Terry analysis referenced above. The stop and detention of that vehicle was not unreasonably long since the driver of the white Chrysler only waited two to three seconds before leaving the area at a high rate of speed before Officer Johnson could even walk up to the vehicle. Therefore the very, very brief Terry stop of the white Chrysler was not unreasonable as to the time and detention. See United States v. Simmons, 172 F.3d 775 (11th Cir. 1999).

48.     Once the white Chrysler took off at a high rate of speed, Officer Johnson's reasonable suspicions were heightened to an even further degree. If there was no criminal conduct afoot, why would the white Chrysler leave within two or three seconds of being pulled over by Officer Johnson? Therefore, he had the right to pursue the vehicle in order to stop it and make further inquiry to either confirm or dispel his suspicion that this vehicle containing the GPS money tracker. The analysis under Terry is dependent upon the

totality of the circumstances and facts are not considered in isolation. United States v. Griffin, 696 F.3d 1354 (11th Cir. 2012).

49. While pursuing the white Chrysler after it failed to heed his command to remain stopped, Officer Johnson observed the driver commit several traffic violations as he related during his testimony. Officer Johnson was justified in attempting to stop that vehicle, make inquiry of the driver as to why they were attempting to elude him, and in fact issue citations if appropriate.

50. The evidence then picks up with Detective Pearson's testimony. He was receiving radio transmissions from law enforcement dispatchers that the GPS money tracker was sending a signal in the Crosstown Parkway area of Port St. Lucie. As Detective Pearson attempted to turn around and head back towards I-95, he observed the white Chrysler run a stop light and commit several traffic violations while traveling at a high rate of speed. He testified that if the vehicle had not committed any traffic violations he would not have paid any further attention to it. However, the information he had within his possession was that the law enforcement dispatchers were getting a signal from the GPS money tracker in that specific vicinity. He then observes a vehicle, which he first believed contained four black males, running a stop light and attempting to elude other police officers who were pursuing that vehicle.

51. Detective Pearson then began pursuit of the vehicle and noticed that it was occupied by a black female driver with three black males as passengers. The passengers were turning around and looking at Detective Pearson as he pursued it. The vehicle made several turns in attempting to elude Detective Pearson and the other officers. The vehicle

is observed violating several traffic laws and going into oncoming traffic lanes on at least two occasions in a further attempt to avoid stopping.

52. Detective Pearson then gets alongside the vehicle and sees this Defendant reach down between his legs towards the floorboard of the vehicle. Detective Pearson had within his framework of knowledge that the persons involved in the bank robbery were armed. He was in fear that the Defendant may be going for a weapon, and then rammed the white Chrysler at least twice to get it to stop.

53. At that time, there were other officers in the roadway near Aster Road as the testimony reflects. Those officers shot at the white Chrysler in an attempt to make it stop. The exhibits entered into evidence reflect where Detective Pearson's vehicle was able to ram the side of the white Chrysler and push it through a grassy area where the white Chrysler ended up abruptly stopping with its front wheels in a culvert.

54. This Court finds no constitutional violation in the actions of Detective Pearson either. He pursued the white Chrysler vehicle after observing it run a red light. The occupants appeared to match the description of the individuals being sought in the bank robbery. Further, the vehicle was in the specific vicinity from where the law enforcement dispatchers were receiving a GPS money tracker signal. This Court finds no constitutional violation in Detective Pearson's actions which resulted in eventually stopping the vehicle and the arrest of the Defendant and other occupants. The GPS money tracker and money taken in the robbery were seized along with a weapon incident to those arrests.

55. When the white Chrysler fled from Officer Johnson's first traffic stop and Detective Pearson's pursuit, law enforcement officers were justified in stopping the vehicle to resolve the ambiguity raised by these attempts to elude the officers. United States v.

Franklin, 323 F.3d 1298 (11th Cir. 2003). This Court finds no constitutional violation by Officer Johnson's original stop of the vehicle. Based upon the totality of the circumstances, he was well within his rights to make inquiry of that vehicle which was in the specific vicinity of the GPS money tracker signal. The totality of the evidence suggested that the persons who committed the bank robbery may have switched vehicles to avoid capture. Therefore, officers were looking for any vehicles with occupants possibly matching the description given of the bank robbers. Before he could even approach the vehicle to confirm or dispel his suspicions, the vehicle took off at a high rate of speed. In his pursuit, he observed the driver commit several traffic law violations. He was justified in further pursuing that vehicle.

56. Likewise, Detective Pearson was justified in attempting to stop the vehicle which had committed traffic violations in his presence. Further, the white Chrysler was also in the vicinity of the GPS money tracker signal based upon the information he was receiving from his law enforcement dispatcher.

57. The Defendant does not challenge any statements that he may have made subsequent to his arrest. While the title of his motion references "statements" as this Court pointed out earlier herein, there was no testimony concerning pre-Miranda or post-Miranda statements of the Defendant. Therefore, there is nothing in that regard for this Court to rule upon. Secondly, the Defendant stated through counsel at the hearing that he was not challenging any search warrant which may have been issued authorizing search the vehicle after it had been stopped. There was no evidence presented in that regard. The motion does not raise any issues concerning any search warrant. Finally, the Defendant presents no argument concerning the search of the vehicle incident to the arrest of the Defendant and the other occupants once the vehicle had been stopped. A warrantless

search of the stopped vehicle was a lawful search incident to the arrest of the individuals who were taken into custody in this instance. United States v. Olbel, 275 Fed. Appx. 910 (11th Cir. 2008).

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant's Motion Suppress [D.E. #170] be denied.

This case is presently set for trial on the District Court's docket of January 27, 2014. In order to give the District Court an opportunity to review any objections which may be filed in respect to this Report and Recommendation, this Court finds that it is necessary to shorten the normal fourteen day time period within which to file objections. Therefore, any objections to be filed by the government or the Defendant in respect to this Report and Recommendation shall be filed **no later than close of business on Friday, January 17, 2014.** Weiss v. Standard Ins. Co., 2009 WL 1833963 (S.D. Fla. 2009). Pursuant to Federal Rules of Criminal Procedure, Rule 59(b)(2), failure to file objections timely waives a party's right to review and bars the parties from attacking on appeal any legal rulings and factual findings contained herein.

**DONE AND SUBMITTED** this ___10th___ day of January, 2014, at Fort Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. Jose E. Martinez
AUSA Carmen M. Lineberger
Valentin Rodriguez, Esq.